Mr. Hill for the petitioner, Ms. Lancia for the respondent. Good morning, Mr. Hill. We'll hear from you. May it please the Court, Richard Hill for the appellant. I should perhaps explain at the outset that the only reason Mr. Winkler is not here today is because he's not here for the petition. I should argue the case is that he retired at the end of last year. The linchpin of the Board's decision in this case is the finding that Aggregate Industries made the unilateral decision to move drivers from the construction agreement to the Rand, Roxanne and Gravel agreement and presented that plan to the union as a fait accompli, thereby excusing the union from any obligation to bargain over the issue. If the linchpin is removed, the Board's case begins to unravel. We submit that that finding is contrary to the record evidence as a whole, and it is specifically contrary to the finding of the Administrative Law Judge, who heard all three days and 553 pages of the testimony in this case. A key witness in the case, as acknowledged by the Administrative Law Judge, was Sean Stewart, who the Administrative Law Judge specifically credited with regard to his testimony concerning the events of 2010. Mr. Stewart consistently testified that Aggregate Industries made the decision to move trucks, or some trucks, and the work of material hauling, but not the drivers from the construction agreement to the Roxanne and Gravel agreement. But how are we to construe, you know, basically the letters that were presented to the union employees on, was it the October 1st meeting? How are we to construe all of that? That's not moving drivers? Well, remember that this, all that occurred after the company sent the request for dispatch to the union under the Roxanne and Gravel agreement. Mr. Stewart, he conceded that he couldn't unilaterally transfer drivers from the construction agreement to the Roxanne and Gravel agreement. And that's why he said, let's talk about it at the July 9 meeting, and that's why on September 24th, the company sent dispatch requests to the union under the Roxanne and Gravel agreement. Had the union sent people on the Roxanne and Gravel out of work list, we would have had a completely different set of drivers, and all of the construction people, all of the construction drivers would have been laid off. Did the union say we're not going to send, or did they say, if you like, we'll send people by seniority? No, the union said, the union's consistent position was you can't do any material hauling under the Roxanne and Gravel agreement, therefore we're not going to provide you with anybody. And then under the Roxanne and Gravel agreement, if the union doesn't provide anybody within 48 hours, then the employer has the right to solicit employees from other sources, and among the other sources was the company said to its existing drivers, if you want to come work for us under the Roxanne and Gravel agreement, we are certainly willing to take you. And it's up to you. It's a voluntary decision on your part whether you wish to work under the Roxanne and Gravel agreement or not. And furthermore, if you wish to work under the transition rates that we've offered to the union, that is available. But the point about this is... You didn't have to do that, right? What's that? The company didn't have to do that. No, they could have hired non-union drivers. They could have... You know, they didn't have to get union members at all to do the work. Once the union says we're not going to dispatch you to anybody, you can go hire off the street. But the company deliberately did not take that course of action, because I think as Mr. Stewart testified all along, they really liked their construction drivers. They wanted to keep those drivers if at all possible. But this is why Mr. Stewart testified that there were really two parts to this July 9 meeting. The first part was he said we're going to move the material deliveries from the construction agreement to the Roxanne and Gravel agreement. And he said the second part was he then asked the union if there's any way that we can move our construction drivers to the Roxanne and Gravel agreement. And the reason for that was? I think they liked the construction drivers. No, no, no. Why move them? Why move them? Well, I think the biggest reason was that their competitors, Semex and one other company, were doing material deliveries under the Roxanne and Gravel agreement at lower rates than aggregate industries. Why do you want to work at a competitive disadvantage to your two big competitors? I mean, this was simply, and that was part of it. The advantage of the lower wage rate. Yeah, the Roxanne and Gravel had non-construction rates. And the other part of it that's kind of the background was that this is 2010. This is the Great Recession. This is when work is contracting throughout the construction industry. And that was really backdrop for all of this. But really, the nub of our position here is. How many drivers were involved in the transfer from construction to ready mix? I believe at some point there were 60 total drivers doing construction, but I don't think all of them transferred. That was my next question. Did any of them refuse the offer? I think most of them. Remember, the company did keep some people. They did have some construction work remaining, so they didn't want to transfer all the drivers. If a driver refused to accept the offer of the graduated pay under the ready mix agreement, would they be fired? No. They simply wouldn't work under the Roxanne and Gravel agreement, and they'd have to wait until work was available under the construction agreement. It was just like any hiring hall in the construction industry. The job is over. You go back to the hall. And under the construction agreement, the company could call people by name, and so those people would get recalled under the construction agreement when work picks up, if work picks up. But there was never any intimation that people were going to be fired if they didn't accept this offer. So there really wasn't much work to go around at that time, right? I'm sorry, Your Honor. There wasn't much work to go around? Well, the work was shifting. The construction work was contracting, but the Roxanne and Gravel work was actually expanding because CEMEX was now giving some of their material deliveries to aggregate industries. So one was contracting and one was expanding. But the real, I guess, crux of our case is that the board has taken one line of testimony out of 535 pages to base its decision on. At page 83 and 84 of the transcript, Mr. Stewart, in response to a leading question, says we were going to move them, referring to the drivers. And if you take that one statement out of context, yes, there is some evidence to support the board's decision. But that one line of testimony is contrary to Mr. Stewart's prior testimony. It's contrary to his subsequent testimony. It's contrary to what the administrative law judge found. And if the substantial evidence test means anything, it means that the board can't take one line of testimony out of three days of a hearing and ignore everything else. And that is really the crux of our testimony. But is that the basis for the board finding that this was an improper altering of the scope of bargaining units? That was the, if you read the board's decision, I can quote it for you, the board specifically quotes those four lines of testimony and says that was why the company made the unilateral decision to transfer drivers as opposed to transferring work. And therefore, it was a permissive subject of bargaining. Let me just make sure I understand your argument. You're not contesting that transferring employees or altering the scope of bargaining units is a permissive category, right? No. If you transfer employees without bargaining with the union, that is technically a permissive subject of bargaining. You can't do it without the union's permission. But in this case, the company did not transfer drivers. They transferred some, not all, of the trucks from construction to rock, sand, and gravel. They said they were going to do the work under the rock, sand, and gravel agreement, and then they wanted to bargain about moving the drivers because they knew they couldn't do it on their own. And the other thing that really undercuts the board's position that this was a permissive subject of bargaining is the fact that under the construction agreement, they had a right to bargain for a supplemental agreement because they were doing rock, sand, and gravel work. But they didn't do that, right? The ALJ found that they didn't do that. Well, the ALJ found that the company told the union of their plans, and then the union never requested bargaining. And had the union ever requested bargaining, the company would have bargained, just as when the union's attorney suggested coming up with some sort of a transition rate, the company, within 24 hours, comes up with a transition rate, presents it to the union, and says to the union, let's talk about it. And the union's response is, we've got nothing. We're not willing to talk to you about it. These were things that the company would have discussed with the union had the union ever said we want to talk. So the union was, in your view, the union was on notice that the company was going to offer its construction drivers the opportunity to And what was the evidence that the union was on notice before the company acted? At the July 9 meeting, Mr. Stewart and the other company representatives said, number one, we're going to move the material deliveries from the construction agreement to the rock, sand, and gravel agreement. Number two, we want to talk to you about moving the drivers because we know we can't do it on our own because of the dispatch procedure under the rock, sand, and gravel agreement that does not allow us to dispatch or request people by name. And there was a meeting August 13th. The union said, you can't do it. And so Mr. Stewart writes a letter on August 13th, and he says, we are going to move the deliveries. He doesn't say we're going to move the people. He's going to say we're going to move the deliveries. And then they request people under the rock, sand, and gravel dispatch agreement on September 24th. They would have taken them, but the union said, no, we're not going to dispatch anyone to you. There's another meeting on September 28th. Again, the positions are locked, and the union's attorney said, well, has anybody thought about a transition rate? So the company goes back to their offices that night or the next day, comes up with a transition rate to pay people a higher rate than the rock, sand, and gravel agreement as they transition. They send it to the union, and they say to the union, well, do you want to talk about this? And the union says, no, we've got nothing for you. We're not talking. And it was only at that point that the company then said to their drivers, well, first to the union, then to the drivers, if you want to come work under the rock, sand, and gravel, you are welcome to do so. You can either work the rock, sand, and gravel rate, or you can work at the transition rate. It's your decision, saying to the drivers, it's a voluntary decision on your part. But once you get to the point that the board has reached the improper conclusion about transferring drivers as opposed to transferring work, it's a mandatory subject of bargaining. We don't think it was presented as a fait accompli. And there was an impasse, as found by the administrative law judge, who said it was a transfer, it was not a fait accompli, and the parties did reach impasse. And I realize I've gone over my time, but I can address those also. I want to make sure I understand. When you talk in your brief, I think it's also referred to throughout the opinions, the ALJ and the board's opinions, about transferring trucks or registering trucks that were, I guess, the SMP trucks to the SNRM, the Southern Nevada ReadyMix, I guess. What does it mean, and how practically speaking is that done? I just don't understand. I didn't see that discussed in the record. Remember, this goes back to the 2008 negotiations for the rock, sand, and gravel agreement. And it was the union, not the company, that insisted. The union's position is that if you're going to move a truck from construction to the rock and sand and gravel operation, the ReadyMix operation, you have to put a different name on the truck. You can't be moving things back and forth. And the company said, okay, we'll do that, and that's why. But that's part of the reason why they delayed in moving the trucks. But the union said that because different companies had different agreements with the union, right? And the company that had the rock, sand, and gravel agreement with the union was the Southern Nevada ReadyMix, right, or SNRM, whatever that stands for. Southern Nevada ReadyMix. Okay. So what does it mean to take a Southern Nevada paving truck and register it as a Southern Nevada ReadyMix truck? I don't mean to be flip about this, but it simply means taking the name off the side of the truck and putting a different name on the side of the truck. So you don't have to go to some government office? You don't have to re-register the truck with any official? I'm not aware of any such requirement. My understanding, it was sort of a cosmetic. The union wanted trucks to be dedicated to either construction or the ReadyMix operation, and the company said, fine, we'll comply with that request. I don't know whether you want me to address the fait accompli argument or not. Well, I do have a question about that, and I'll ask the board this as well. In the other cases, I have not looked at all of them, the other cases where the board has said that this was a fait accompli, were they simply saying, did they simply involve the employer, presumably the employer, having taken a firm decision by that point, or is it that they actually, the employer actually did something? You mean other cases where there was a movement, where there was a change in the scope of the unit? Well, not necessarily, but whenever the board has used this fait accompli doctrine, if you will, it seems to me they may be perfectly consistent, but it's not, it doesn't jive with what the term means. Having taken a firm position is not the same as having implemented it. Well, yeah, I think these are fact-driven decisions because fait accompli means that you go into these negotiations and you're not even willing to discuss it. It's not that you've implemented or done it, you're just not willing to discuss it. That's right, and there's all this evidence that in this case the company was willing to discuss it. So it's for bolerism, basically. Bolerism is the term used when you just say you walk in the first day of negotiations, this is my offer and I'm not changing it. We've got all this evidence in this case that the company was willing to talk about it. At the July 9 meeting, they were willing to talk about the transfer of drivers. There was discussion about how many trucks were going to be transferred. The union said, well, why don't you do it like CEMEX? Why don't you put all your drivers under the rock, sand, and gravel agreement? And then when they work on construction projects, you just pay them at the higher rate. And the company said, well, you know, we hadn't thought about that. Let's think about it. I guess the other key thing that shows the company's flexibility is that when the union's attorney talks about a transition rate, they put one together. Had the union responded, they might have come up with a different proposal. The suggestion to which the employer responded with a transition proposal was that any one work employee would operate under one contract or the other, depending upon what work they were doing at the time? I think I understand the question. The union's position was that you can only do these material deliveries under the construction agreement. You can't do them under the rock, sand, and gravel agreement. Therefore, we're not going to talk to you at all about it. I thought you said the idea was suggested that an individual could work under the two different contracts, depending upon the work that they're doing. The union's suggestion at the July 9 meeting was, why don't you put everybody under the rock, sand, and gravel agreement, which is the lower rate, and then when they work on construction projects, just pay them the higher rate, and you don't have to be requesting that these people be re-dispatched. Okay, so it was not that they would get, when they're doing construction work, it's not that they would be under the construction contract with all of its terms, just that they would get that wage rate. That's the way the company understood the proposal, and they said, well, we hadn't really thought about that. Right, okay. But on the fait accompli, the ALJ is the one who heard all of the testimony and the evidence. He sits through this, and he says, well, this is not a fait accompli. The company was willing to discuss all of these issues. It was really the union that was intransigent. Was the company willing to discuss whether it was going to move trucks? As evidenced by the July 9 meeting, yes, because there was actually discussion about how many trucks would be moved from construction to rock, sand, and gravel. And it was the company's position that they were going to keep about 20 in construction and move the rest over to rock, sand, and gravel. But the company said they were definitely going to move trucks, right? That's right. They said they were going to move trucks and they were going to move the work. And our position is that once you tell that to the union on July 9, the union has an obligation to raise their hand and say, we want to bargain about this. And what the ALJ found is that the union never requested bargaining about any time. The union's only response was, you can't do it. But what if we think that the evidence in the record supports a conclusion that the company had made up its mind that it was going to move the trucks? Even let's put aside the finding about moving employees. That's not a fait accompli under this new law? Number one, the evidence is that any time the union requested to bargain about something, the company did. But furthermore, the company's position that this was a contractual right. The company believed it had a contractual right under the rock, sand, and gravel agreement. And it believed, alternatively, that it had a right under the construction agreement to at least negotiate for a supplemental agreement. And it believed that it had the right under the most favored nations provision of the rock, sand, and gravel agreement to haul materials at the same rates as its competitors. And the record is that its competitors were hauling materials under the identical rates as the rock, sand, and gravel agreement. And the board has never addressed any of those contractual issues. And part of the reason we're here is that the union, for whatever reason, we'll never know, chose not to file a grievance. And the preferred arbiter of what a collective bargaining agreement means is an arbitrator. And it was really the union's decision to present this case to the board as a contractual violation masquerading as an unfair labor practice charge. Can I ask you, do these two agreements, the construction agreement and the ready mix agreement, contain a definition of the bargaining unit? Well, I think the bargaining unit is really defined by job classifications. And part of the company's position is that there is a classification in the rock, sand, and gravel agreement for people who do the material deliveries. And that's such a classification in the construction agreement? Yeah, there's also a classification in the construction agreement. Is there any difference between the definition of the bargaining unit between the two agreements? No, I think there's really a definition. Most construction agreements are actually defined by the scope of work covered. So the construction agreement is going to have your typical definition of construction industry work, work done at the site of construction, alteration, maintenance, repair at the site of construction. And the rock, sand, and gravel agreement not being a construction agreement. If a driver were moving gravel on the work site, the construction work site, would that be covered by the ready mix agreement? That's clearly construction work, and the record is that aggregate industries continues to use the construction agreement for that type of on-site work and pays construction rates. But that would be the only thing left of the construction agreement, right? Well, that's a lot of work, because any time they're working at a construction site, it would be water trucks at the construction site. But delivering to the construction site, formerly part of the construction agreement, became part of the ready mix agreement. Yes, just as aggregate industries' competitors used their rock, sand, and gravel agreements to make deliveries to the construction site. And the whole problem was that aggregate industries was at a competitive disadvantage as long as its competitors used the rock, sand, and gravel agreement for material deliveries, and the union was trying to force it to pay the higher construction rates for the identical work. And I think the record is undisputed that aggregate's competitors were doing the identical work under the rock, sand, and gravel agreement. And this is a multi-employer agreement? The construction agreement definitely is a multi-employer agreement. The rock, sand, and gravel agreements are, I believe, individual agreements, although the economic terms were identical. Does the record reveal how it is that the other two firms managed to move this work? I think the only thing the record reflects is that the other two competitors did do the material deliveries to the construction sites under the rock, sand, and gravel agreement at the wage rates that aggregate industries wished to utilize. So as far as we know, they may always have done it that way. I think they probably did because the competitors were not also in the construction field, so they didn't have the issue of having a construction agreement and a rock, sand, and gravel agreement. And this is the age-old problem of people going back and forth between construction and non-construction. It's always cleaner if you do one but not the other. It's always messy when you move back and forth. Is road building construction? Yeah, that would be considered construction. What is sand and gravel used for other than construction? Sand and gravel is used for construction, but those would be considered supply items. And under the NLRB's definition of what is construction work, the delivery of supply items to the job site is not construction work. On the other hand, if you deliver something to the construction site and then remain at the construction site to help lay it down, that becomes construction work. But if you drive rock, sand, and gravel to the construction site, you drop it and leave, that's considered a supply function, not part of the construction process. I think you said a few minutes ago that the bargain unit is defined by the list of job classifications in the collective bargaining agreement. Is that correct? Yeah, particularly the rock, sand, and gravel agreement, which is a non-construction agreement. Okay, so were these units ever certified by the board, or were they just bargained? Well, I think there's kind of a long, tortuous history of how the certification of the rock, sand, and gravel agreement occurred. It occurred before aggregate industries took over and before they decided to expand their rock, sand, and gravel operation. But I think just to sum up... I'm not sure that, maybe you don't know, but I'm asking whether this allocation of job classifications was purely the result of bargaining, or whether there had been an election and a unit determination by the board at some time in the past. It's a combination. Initially, there was a certification of just a small ready mix unit before aggregate industries took over. That operation was shut down, and the operation was essentially dormant. But then the rock, sand, and gravel agreement was eventually negotiated at a time where no work was being performed, but aggregate industries was planning to, the testimony in the record is, become a player in the aggregate industry. And after the agreement was negotiated in 2008, that's when aggregate industries opens up the various rock, sand, and gravel quarries. But to sum up our position, this was not a permissive subject of bargaining because it was a transfer of work and not a transfer of drivers. But once you get to the issue of it being a mandatory subject of bargaining, the company did bargain in good faith. The company did exhibit flexibility, and as found by the administrative law judge, there was an impasse. And certainly an excellent indication that the parties were impasse is that the union was totally unwilling to negotiate about a transition rate, and the union went on strike. All of those are indications that the parties were at impasse as found by the administrative law judge, and there was no good reason for the board to overturn the findings and indeed the credibility findings of the administrative law judge in this case. The unions having gone on strike doesn't reflect the issue of whether it was an impasse or they're protesting the unilateral activity. Well, I think it is an indication that the parties have reached the position where their negotiating positions are not moving. The company had tried various things. It had tried to talk to the union about moving the drivers. It had requested that the picketing of the strike could reflect the refusal to bargain as opposed to an impasse. I think the case law is that a strike is an indication of an impasse. It's not a conclusive indication, but I think coupled with the other evidence in this case, it is evidence that the parties were at impasse as of October 11th or whatever the date is as found by the ALJ. Okay. Thank you. Thank you. Good morning. May it please the Court. Nicole Alonzo for the National Labor Relations Board. We're seeking enforcement of the board's order finding that the company violated Section 85 and 1 of the Act by refusing to bargain with the union. That's the collective bargain representative of two different sets of drivers. The off-site material haul drivers and the mechanical super truck drivers. Now, focusing on the off-site material haul drivers, I just want to address a few statements made by my opposing counsel. First of all, he stated that the board's fait accompli finding or unlawful transfer of unit work was the lynchpin finding of the board's decision and order, and that's simply not correct. The board found that the company's movement of about 60 material haul drivers, about the whole unit, from the construction agreement and the construction unit to coverage under the ready mix agreement and ready mix unit, was an unlawful change in the unit scope, a permissive subject of bargaining over which the union was not required to bargain and which the company could not unilaterally implement without the union's consent. Again, and also in that realm, counsel makes frequent reference to the administrative law judge's finding and the alleged deference that he gets. The board gives deference to the administrative law judge as to credibility resolutions because the judge is the one who has heard and saw the witnesses testify. However, the board considers the evidence, the briefs, the exceptions, the administrative law judge's recommended decision and order anew. It is not required to give deference to the factual findings of the administrative law judge. And here, based on the board's review of the record evidence, substantial evidence supports its finding that it was an unlawful change in unit scope. The company did move drivers. It's not just about the trucks. They moved the drivers, the material haul drivers from the construction unit and coverage under the construction agreement to the ready mix unit. As to the board's alternate finding that the company's actions could have constituted an unlawful transfer of unit work, yes, that is a mandatory subject of bargaining over which the company is required to notify the union of and give them an opportunity to bargain. But as the board found here, the company presented since day one on July 9th the union with a fait accompli. A notice of a fait accompli is simply not the sort of timely notice on which waiver or impasse defenses are predicated. Here, since July 9th, and company counsel acknowledges this, Sean Stewart conceded and told the judge at the hearing that they were going to move the drivers. They were not considering moving the material haulers, but they were going to move them. And this is on footnote 9 of the board's decision where the transcript is recounted. Going to move drivers or going to move trucks? It says, based on the testimony which is available at footnote 9 of the board's decision, that we were going to move them, referring to material haulers in the question, and the main purpose of our meeting was to discuss whether we could keep our own drivers. But they hadn't. They hadn't done it at that point, right? No, not at that point, Your Honor. So that's a bargaining position. Well, Your Honor, if that was the only meeting, that might be a possibility, but considering the record evidence, which the board did consider in deciding that a fait accompli had been presented, on August 13th, Stewart sent a letter to the union representative, Day, at that time, saying, quote-unquote, material deliveries will be performed by the construction unit employees under the ReadyMix agreement. And as late as September 27th, Stewart also sent another letter to the union, saying now that the ReadyMix agreement gave the company the, quote-unquote, right to use offsite material haul drivers under the ReadyMix agreement. That same day, or the next day, excuse me. Why aren't all those representations just simply bargaining positions? That happens all the time. Well, Your Honor, it's important to remember that a fait accompli is not about what is being implemented per se. It's a demonstration of a fixed intent to implement a proposal. That the decision, or the proposal in this case, of moving up drivers in the work to coverage under a different agreement, was final and non-negotiable. And the language of not only Stewart's testimony, but the letters that were sent to the union, demonstrate that fixed intent, that they're going to move the drivers. The material deliveries will be performed by construction employees under the ReadyMix agreement. We have a right, management's right, to move the drivers and the work to coverage under this agreement. And the union was just as firm saying that you don't. And we're not going to agree with you at all. Why isn't that an interest? Well, under settled board and court law of the circuit, once the union is presented with a fait accompli, no impasse is possible because the union never had meaningful notice or an opportunity to bargain. Since July 9th, and continuing up until the end of September, the company demonstrated a fixed intent to transfer the drivers and that work. And therefore, the union could not have bargained impasse. July 9th to the end of September is not sufficient notice? Again, notice of fait accompli isn't the type of notice on which an impasse or waiver defense is predicated. Also, at the end of September, September 30th, when Stewart and Day were discussing potential transition wage rates, they weren't discussing whether or not they can move the drivers at any point. The company wasn't attempting to bargain over whether drivers could be moved. It had already been decided. And now they were just trying to discuss what transition rates we would use, or the company would use to move the drivers from the $30 an hour about construction agreement wages to about $23 an hour wages under the ready mix agreement. So that wasn't even bargaining over the movement of drivers at that point. It had been decided. But your opponent says that you're collapsing all of this because they initially, the other testimony, not just the one line that the board cites in the footnote, shows that Mr. Stewart was talking about moving trucks. And then he asked for the union to provide drivers with its dispatch request. And it's only after the union doesn't provide any drivers and says that they're not going to that he presents this transition rate proposal, et cetera. So he says that this happened kind of in two stages, and you're presenting it as one stage. At least I think that's what they're recommending. Well, if I understand Your Honor's question correctly, I think it's the testimony that counsel keeps referring to about going to move the drivers. That goes to the board's finding of the alternate finding of the transfer of unit work and a fait accompli. That is not any basis for the board's finding of an unlawful change in unit scope. So in terms of the July 9th meeting, the August 13th letters, the September 27th letters, the transition wage rates, that I think would fall under the board's finding as to the unlawful transfer of unit work. But again, because either let's say we view it as an unlawful change in unit scope, as a permissive subject of bargaining, the union was not required to bargain over it, and the company could not implement it without the union's consent. As a transfer of unit work, however, the board found, and substantial evidence supports this finding, not just based on one line of testimony but on all of the testimony and on the exhibits, the letters with the language demonstrating a fixed intent, and that the company unlawfully presented its proposal to transfer the drivers and the work to the readiness agreement as a fait accompli. So the union, there's no indication that the union was required to fill the dispatch request under either characterization. Either or both characterizations would represent an unlawful unilateral change in terms and conditions of employment. So you're saying that even if we find that it's a transfer of unit work, which is a mandatory subject of bargaining, if we also agree with the finding that it was presented as a fait accompli, then the employer loses because waiver and impasse are defenses? Yes, Your Honor. That would be correct. Because if a party is presented with a fait accompli, under this court's law of regal cinemas, notice, there was no notice or meaningful opportunity to bargain, and waiver and impasse are impossible. But I think it's also important just to understand the difference. So a change in unit scope would be the performance by the same employees of the same work, same equipment, same locations, but now they're members of a different bargaining unit, which is what the board found happened here. About 59 drivers performed the same material hall work using the same trucks at the same locations, phone car, and construction sites, but now they were covered under the ReadyMix agreement, and that diluted the strength and the size of the construction unit, which only had about 60 employees to begin with, and now enlarged the ReadyMix unit. What's the strength of the remaining unit? Why is that relevant to the question of what happened? Well, it's relevant to understanding that the company's movement here, and I guess the significance of the unlawfulness of its actions, severed the link between a recognizable group of employees, the construction unit employees, whom the construction agreement defines with respect to specific job classifications, severed the link between them and the union that represents them, and now they no longer bargain with other employees in the unit to which they belonged, and now they're part of a completely different unit with different terms and conditions of employment. In addition to all that, the board said, and you reiterated, that that left the local that lost the workers in a less strong position vis-a-vis the employer. Well, the board found that it did dilute the bargaining strength of the construction unit and enlarged the ReadyMix unit, but what I think is important to remember here is that the units are defined, and the construction unit was defined with reference to the specific jobs that were performed, the specific positions, the off-site material haul driver positions. By removing those positions from the unit and those drivers performing the same work with the same equipment for the ReadyMix unit, that constitutes an unlawful change in unit scope. An unlawful transfer of unit work would be the performance of or transfer of work from unit employees, your construction employees, to non-unit employees. And as members of a ReadyMix unit, they would not be unit employees. So I think that distinction is important to understanding the basis for the board's primary and alternate finding. If a truck delivered gravel to a construction site under the ReadyMix agreement, is that within the scope of the bargaining unit? Well, it depends, I think, on what bargaining unit you would be referring to. I'm not sure I understand your Honor's question. The employees who were covered by the ReadyMix agreement can certainly perform work under the ReadyMix agreement. Is there a definition of what the agreement includes in terms of the work involved, the ReadyMix agreement? Yeah, well, both agreements, but the ReadyMix agreement also contains driver classifications, like S and G bulk or sand and gravel, powder, these different classifications. And within the agreement, they define what types of trucks are used and at what locations. So we have two agreements, and the definition of the bargaining units in each one overlap. No, they do not, your Honor. I believe that that was a misstatement on counsel's part here. The construction agreement has driver classifications, including off-site material haul drivers, mechanical super truck driver. The classifications are completely different. The classifications, such as transport driver bulk or transport driver S and G, only appear in the ReadyMix agreement. They do not appear in the construction agreement. So, again, the- I thought there were other companies that were doing essentially the same thing as this particular employer was doing under the construction agreement, yet they were doing it under a ReadyMix agreement. Isn't that the evidence? I thought it was. No, there are other ReadyMix companies that had ReadyMix agreements. But I think it would be-I don't think we can conflate the construction agreement and the ReadyMix agreement. Here, the construction agreement was something that Southern Nevada Paving S&P and Frayner Construction, as members of a multi-employer association, were signatories to. SNRM, Southern Nevada ReadyMix, was not a signatory to that agreement. It had a separate agreement, which is what we refer to as the ReadyMix agreement. And those other companies, frankly, in those agreements, have no bearing on what the construction agreement or the construction agreement and its classifications of employees. In that regard, the company claims that contractual provisions in-oh, excuse me. I apologize. I know I'm over my time. You can finish your point. Thank you. That certain contractual provisions in both the construction agreement and the ReadyMix agreement support its actions here, but that's simply not the case. This is not a matter of contract interpretation. It references Article 33-43, excuse me, which is in the construction agreement, allowing the company to negotiate for supplemental agreements. However, as I just alluded to, neither Southern Nevada ReadyMix nor Aggregate were signatories to that agreement, so it could not use that agreement as a basis for its actions here. Furthermore, they reference the most favored nations clause allowing, you know, if the union enters a collective bargaining agreement with another ReadyMix employer and there's more favorable terms in that agreement, then the company can adopt the more favorable terms of the other ReadyMix agreement. But here, again, what's relevant and what's telling are the facts, the record evidence. The company didn't even do what it claims that that clause would allow it to do. It didn't keep the construction unit intact and then apply the more favorable terms of only the more favorable terms of the ReadyMix agreement to the material haul drivers. It actually moved those drivers out of the construction unit and into a ReadyMix unit with an entirely different set of terms and conditions of employment. And lastly, before I conclude, I just wanted to say with respect to the denial of employment opportunities finding that the company waived that issue before the court by failing to raise it in its opening brief. Page 17 of its brief actually admits the underlying facts of that violation, and it references pages 26 to 36 in its reply brief as evidence that it did not waive the issue, but those pages do not demonstrate any argument, specific or general, with respect to that violation. This is the two employees? I'm sorry? You're talking about the violation? No, this is when the company distributed the forms to the drivers and actually required them to accept them as a condition of continued employment. Either you accept these terms and you work under the ReadyMix agreement or you're not working. That can hardly be considered voluntary. Is it accurate to say that the employer here could have simply discharged the workers, the 60 or so of the drivers, and asked the union to send new people for the laborers' contract? I'm not entirely sure. It seems to me, based on the record of evidence, that they would have had to have been re-dispatched to the company under SNRM, because, again, I mean, though it's aggregate industries and there was a merger, the company still operated under their fictitious trade names. So you had S&P and Frayner doing the construction agreement work and SNRM doing the ReadyMix work. So either, as was discussed during the 2008 negotiations, transfer, change the names on your trucks, which is not just an aesthetic change. It would be an agreement that this work is now going to be performed by SNRM and using SNRM trucks. We're not transferring trucks to you, which was what was discussed at the time. We're not transferring the trucks? No, at that time, the union said that they would have had to replace the SNRM on the door with – excuse me, they would have had to replace S&P with SNRM on the door, and Stewart credibly testified that that was something that was discussed and, quote-unquote, it wasn't something the company was willing to do at that point. Just change the paint? Transferring trucks or assets. Ultimately, that was never – The ownership would still remain with the first corporation. Right, and what was decided, though, there was a memorandum of understanding where the company and union agreed to transfer nine off-site material haul drivers to coverage under the ReadyMix unit, and that was agreed upon and consented to by the union in 2008, and that was not ever presented here. There was no memorandum of understanding or anything in writing, and as Vice President Stewart conceded, the only thing in writing was, in his opinion, the contracts, which gave it the alleged right to do what it did, which the board maintains that did not give it that right. I know my time is up, so I just wanted to briefly ask the court to find that substantial evidence supports the eight violations of Section 85 and 1 found by the board in this case, that the company unlawfully failed or refused to bargain with the union as the collective bargaining representative of the off-site material haul drivers, and the mechanical sweeper truck drivers, and to enforce the board's order in full. Thank you. Thank you. All right, Mr. Hill, you're out of time, but we'll give you two minutes for rebuttal. I want to make just a couple quick points. In the joint appendix at page 385, these are the job classifications in the rock, sand, and gravel agreement. There is a classification for a transport driver S&G. That's a transport driver for sand and gravel. That is the job classification that aggregate industries identified in the rock, sand, and gravel agreement and why they believe they had a contractual right to do material haul deliveries under the rock, sand, and gravel agreement. That is the identical rate that Cemex and its other competitor was using to perform the identical work. It is incorrect to say that there is no job classification in the rock, sand, and gravel agreement that covers the work. The other thing I would specifically like to direct the court's attention to is footnote 34 of the administrative law judge's decision. This is what the administrative law judge wrote. Stewart denied ever stating today the respondent would just transfer the material haul drivers from one bargaining unit to the other, thereby bypassing the hiring all procedure of the collective bargaining agreements. This was a credibility determination by the administrative law judge. Mr. Stewart never said he was going to unilaterally transfer the drivers. And by writing its decision the way it did, the board has rejected the credibility determination of the administrative law judge, and we believe that it's not permitted by the court's precedent. But that's in a footnote. The court didn't, the board didn't, I'm sorry, the ALJ didn't say one way or the other whether it was crediting that particular statement. What's in the text refers to the letter that Stewart drafted around that time, which said that material hauls for the company will be performed by Teamster employees under the rules and regulation of the ReadyMix agreement. Well, but Teamster employees includes everybody. That includes construction drivers as well as rock, sand, and gravel drivers because these are all members of the same unit. So that statement doesn't indicate. Same union. That statement doesn't indicate that he's going to take the construction drivers to the rock, sand, and gravel agreement. But I think more generally what the administrative law judge said is that with regard to the events of 2010, I think that Sean Stewart was credible and I believe the way that he described the events of 2010. And he specifically says this is really how I am basing my decision. And that includes note 34 in my view. All right. Thank you. We'll take the matter under advice. Thank you.
judges: Wilkins, Ginsburg, Randolph